J. H. HARRIS, ON BEHALF OF HIMSELF AND ALL OTHER TAXPAYERS OF THE CITY OF DURHAM WHO MAY DESIRE TO JOIN WITH HIM, v. CITY OF DURHAM, ITS MAYOR AND ALDERMEN.

(Filed 8 June, 1923.)

**Municipal Corporations—Charter—Sales—Public Purposes—Ordinance.**

> Where a city owns a building used for public purposes and an adjoining lot, it may sell same under the provisions in its charter allowing a sale, either publicly or privately, of public places and buildings under an ordinance passed by a recorded affirmative vote of at least seven of the members elected to the council.

APPEAL by plaintiffs from *Bond, J.*, at May Term, 1923, of DURHAM.

This was a civil action of the plaintiff on behalf of himself and all other taxpayers of the city of Durham against the city of Durham, its mayor and aldermen, to restrain and enjoin the defendants from selling for a sum not less than $250,000 all that certain lot of land in the city of Durham, bounded on the east by Corcoran Street, on the north by Chapel Hill Street, on the west by Market Street, and on the south by Parrish Street, and the lands of the Durham Loan and Trust Company.

By agreement of counsel, his Honor, Judge Bond, found the following facts:

That heretofore, to wit, in 1901, the defendant, the city of Durham, acquired by fee-simple deed, without restriction or reservation, a tract of land in the city of Durham, and thereafter sold a part of this land to the United States Government for a postoffice site, and on a part of the remainder erected a building to be used at that time as a city market and auditorium, and containing also a small number of rooms to be used by city officials, the remainder of the lot being that portion not covered by the building, was used for several years as a hitching lot. Later the building was partially destroyed by fire, and from the insurance collected a new and modern market was erected on a lot purchased elsewhere for that purpose; the original building was reconstructed into a city auditorium, which is now leased by the city for the purpose of a theater and moving-picture house, the city retaining a few rooms, which have been used as offices for the city officials.

The use of the vacant lot as a hitching lot was condemned by the health authorities of the city, and in 1916, at the request of certain citizens of the city, it was determined to beautify said lot and change its unsightly condition, and the then governing body passed a resolution to the effect that it be laid out as a park, and a band-stand erected thereon.

Owing to the continual growth and expansion of the city, and its business affairs, including the acquiescence of a municipally owned water plant, the offices originally arranged for the city officials having been outgrown, and are now entirely inadequate to house the officials and properly take care of the business of the city, and as a result the city is now, and has been for some time, paying rent for offices for a part of its forces. Also, owing to the growth of the city, the school facilities, and especially the high school facilities, of the city, are crowded and inadequate for the school children, and the school board of the city desires an extension of the high school building by an addition of a wing thereto, and containing some eighteen or more schoolrooms, so as to relieve the present crowded condition of the high school and to provide for the yearly increase of high school students.

The city authorities, through a committee of their body, have made a thorough investigation of the situation, and are of the opinion that the old municipal building and the lot adjacent can be disposed of for a sum of approximately $250,000, sufficient to purchase another building in the city and to renovate it and to so change it as to adequately accommodate not only all the offices and departments of the city government at present occupying the old municipal building, but also all other departments of the city which are now occupying rented quarters, and also to accommodate various other activities of the city such as affording an armory for the military company, rooms for the boy scouts, meeting rooms for the assembly of citizen, the American Legion, and such like, including a large and commodious auditorium which can be leased as a theater or academy of music, as is done in the old building. In addition to the amount to be expended in the acquisition and reconstruction of the building referred to, there will be derived from the sum received from the sale of the old building, a sufficient amount to make the addition to the high school building desired by the school board, and to beautify the grounds of the high school, which grounds consist of about fifteen acres of land, the contemplated improvement of which consists of playgrounds, walkways, baseball park, and other attractive features, all of which total a large improvement to the actual facilities and attractions of the city.

In addition to securing a modern municipal building, a much needed addition to its schools and playgrounds for its school children, the city will benefit by a large saving in rents which it is now compelled to pay, by a large amount of taxes which will be collected from improvements which may be made upon the site which the old municipal building now occupies, and from a large increase in efficiency in the handling and conduct of the city's business affairs.

Upon the evidence offered and duly considered, I find that there has never been a dedication of the vacant lot of land lying west of the old municipal building as a public park, there being no intention at the time the city beautified said park to so dedicate or set same aside as a park indefinitely, for the reason that at that time, and several times since then, the city has contemplated using the said vacant lot for other purposes.

I find further that it will be greatly to the advantage of the city to dispose of its present holdings referred to in the complaint and answer, and to convert same into other holdings, as set forth in the answer, and in these findings of fact, and that such disposal and conversion will work greatly to the benefit of the city of Durham, its citizens and taxpayers.

I find further that the city has the authority and power to sell or dispose of said lot and to so invest the proceeds derived from said sale, such power being specially conferred by section 1, section 32, and section 48 of its charter, to wit, Private Laws 1921, ch. 142.

Upon the facts found by his Honor, he dismissed the prayer of the plaintiff for a restraining order, refused to enjoin the defendants, and authorized the defendants to proceed with the proposed sale of the property in question in conformity with the provisions of its charter.   From this judgment the plaintiffs appealed, assigning error.

*W. J. Brogden, J. L. Morehead, and W. L. Foushee for plaintiffs.*
*S. C. Chambers for defendants.*

CLARKSON, J., after stating the case:   The only legal question presented by the appeal is the power of the city of Durham to sell property owned by the city and used for governmental purposes and a vacant lot. Briefly summing up the facts as found by the learned judge who tried this case:  It is the intention of the city of Durham to sell certain municipally owned property, consisting of the old Municipal Building, in which are located certain offices of the city government, and the adjoining lot, and with the funds derived from such sale to:

(a) Secure a new building and to renovate this building for use as a municipal building, which will take care of and accommodate all the offices and departments of the city government, furnish an auditorium, afford an armory for the military company, rooms for the American Legion and Boy Scouts, and other useful purposes.

(b) To get a sufficient sum to make an addition to the high school building—to beautify the high school grounds, which consist of about fifteen acres of land—the contemplated improvement consisting of playgrounds, walkways, baseball park, and other attractive features.

The intention of the governing body of the city, and those in authority elected by the people, is to have modern, up-to-date conveniences for its governmental agencies, and to improve the high school and carry out other laudable civic improvements for the social well-being of the community—a forward-looking, constructive program for the uplift and betterment of the city and its inhabitants.

It appears from the facts found in this case that the governing body will have funds sufficient from the sale of the old Municipal Building and the adjacent lot to do all these things.   Can this sale be legally consummated and the purchaser acquire a good title in fee simple is the sole question presented in this case.

C. S., 2688.   *"Public sale by mayor and commissioners.*   The mayor and commissioners of any town shall have power at all times to sell at public outcry, after 30 days notice, to the highest bidder, any property, real or personal, belonging to any such town, and apply the proceeds as they may think best."

The above general law was in existence when the Legislature of 1921 (see Private Laws, ch. 142) granted practically a new charter to the city

of Durham. This new act is comprehensive, and seems to be a modern constructive charter to meet the new conditions of a thriving and prosperous city.

Section 1 of said charter is as follows: "That the inhabitants of the city of Durham shall be and continue as they have been a body politic and corporate, and henceforth the corporation shall continue to bear the name and style of the 'city of Durham,' and under such name and style is hereby vested with all the property and rights of property which now belong to the corporation, and by this name may acquire and hold for the purpose of its government, welfare, and improvement, all such estate as may be devised, bequeathed, conveyed to, or otherwise acquired by it, and may from time to time sell, dispose of, and invest the same, as shall be deemed advisable by the proper authorities of the corporation, and as shall be in conformity with the provisions of this charter."

Section 32. "The rights of the city of Durham in and to its streets, avenues, parks, bridges, cemeteries, markets, and other public places and buildings, and its waterworks, shall not be sold except by an ordinance passed by a recorded affirmative vote of at least seven of the members elected to the council, and under such other restrictions as may be imposed by law."

Section 48. "Among the powers hereby conferred upon the city, all of which the city council shall be authorized to exercise unless otherwise provided by this charter, are the following: . . . To acquire by purchase or condemnation, lay out, establish, and regulate parks and public playgrounds within or without the corporate limits of the city for the use of the inhabitants thereof. . . . To sell and cause to be sold publicly or privately any property, real or personal, belonging to the city, and all of its rights, title, and interest in and to all land used for street or other public purposes, but such sale shall be made in conformity with the provisions elsewhere set forth in this chapter."

The record in the case shows that all the requirements of the charter that provides for the sale of "other public places and buildings" have been fully complied with.

The charter of the city of Durham is a special act. The provisions of the charter in the sections before mentioned confer full power and authority to sell the property in question and make title in fee simple. The sale under the express provisions of the charter can be made either publicly or privately by complying with the provisions of the charter requiring "an ordinance passed by a recorded affirmative vote of at least seven of the members elected to the council." *Allen v. Reidsville,* 178 N. C., 513. The charter of the city of Durham has amply protected its taxpayers by providing that the property contemplated to be sold could not be done "except by an ordinance passed by a recorded affirmative vote of at least seven of the members elected to the council." These men

are elected by the taxpayers and legal voters of the city of Durham. There seems to be a strong tendency on the part of the legislative branch of the Government to give all municipal corporations large powers for educational and social betterment. These powers should be used with caution for the common good, without extravagance or waste, but with economy and care. The governing body of the city of Durham seems to be carrying out this general policy, and, under its charter and law, it has a right to do so.

On all the facts, his Honor was correct in dismissing the prayer of the plaintiffs for a restraining order, and refusing to enjoin the defendants.

Affirmed.